MARVEL INDUSTRIES, INC., a Corporation, Respondent, v. THE BOATMEN'S NATIONAL BANK OF ST. LOUIS, a Corporation, Appellant, No. 42054—239 S. W. (2d) 346.

Division One, April 9, 1951.

Rehearing Denied, May 14, 1951.

*Chas. Claflin Allen* for (defendant) appellant; *Lehmann & Allen* of counsel.

10

*J. Porter Henry* for respondent; *Green, Hennings, Henry & Evans* of counsel.

HOLLINGSWORTH, J.—Plaintiff (respondent) brought this action against defendant for the recovery of $16,000 deposited by plaintiff with defendant in accordance with the provisions of a three-party contract for the sale of 196 tons of sheet steel, in which contract plaintiff is designated as "purchaser", one R. E. Mullen as "seller" and defendant as "escrow agent".

Following verdict and judgment for plaintiff in the sum of $16,000 and accrued interest, defendant appealed. The grounds of its appeal are: that no submissible case was made; error in instruction No. 2 given in behalf of plaintiff; and refusal of the trial court to declare

a mistrial because of an alleged prejudicial voluntary statement made by one of plaintiff's witnesses.

The first assignment requires a detailed statement of the facts. To follow their import, it will be of advantage to first state the issues presented to the trial court. They were: whether certain purported bills of lading accepted by defendant from the seller, Mullen, and in return for which defendant paid over to Mullen $16,000 deposited by plaintiff with defendant as escrow agent, were forgeries; if they were forgeries, whether plaintiff had ratified their acceptance; and, if plaintiff had not ratified their acceptance, then whether defendant had exercised such care in their acceptance that it should not be held liable for breach of its contract.

The issue of forgery was submitted to the jury at the instance of plaintiff. The issue of ratification was submitted at the instance of defendant. Both issues were found in favor of plaintiff. The issue presented by defendant that it had exercised due care and, therefore, was not liable even though the bills of lading were forged was rejected by the trial court. Defendant again presents that issue as one of the grounds that no submissible case was made. Inasmuch as defendant makes no complaint of the finding against it on the issue of ratification, the details of the evidence on that issue will be omitted.

Plaintiff, a corporation engaged in the manufacture of component parts used in construction of house trailers, is domiciled in Detroit, Michigan. In January, 1948, Carl J. Wagner, its president, came to St. Louis in quest of steel. He was there introduced to Mullen and made a tentative oral arrangement with Mullen for the purchase of steel. Wagner and Mullen then went to the trust department of defendant, a banking institution, in St. Louis. They there met Andrew C. Gunter and other officers of defendant. Following discussion, it was agreed that Wagner would return to Detroit and have a three-party contract drawn in accordance with their discussion. This was done by Wagner. The contract, drawn in triplicate, was executed by plaintiff, forwarded to defendant, and there executed by defendant and Mullen. One copy was retained by each of them and one was returned to plaintiff.

The contract is dated January 31, 1948. The parties are designated as above stated. Mullen agreed to sell plaintiff 196 tons of sheet steel of designated sizes, which Mullen therein represented to be located in New Orleans, Louisiana. Shipment was to be made not later than February 14, 1948, to plaintiff at Sturgis, Michigan, f.o.b. New Orleans. The purchase price was $160 per ton. The contract then recites:

> "Marvel Industries, Inc., the Purchaser, deposits herewith on execution of this Agreement, as part of the purchase price, $16,000.00, in escrow with the Trust Department of The Boatmen's National Bank of St. Louis, as Escrow Agent. The said Bank

is hereby authorized on behalf of the Purchaser to pay to the Seller, R. E. Mullen, the said sum of $16,000.00 upon presentation to the said Bank of the original Bills of Lading from the railroad, showing shipment of all of the steel above described, said Bills of Lading to show each railroad car number with detailed list of all steel contained in each car, showing gauge, sheet sizes, and steel tonnage in each car. Said Bank shall thereupon forward all of said Bills of Lading to Marvel Industries, Inc., * * * and said Bank shall thereupon be discharged from its part of this Agreement.''

Further provisions are that upon its receipt plaintiff would unload and inspect the steel, and, upon verification that it was as represented to plaintiff, would pay the balance of the purchase price to Mullen at his St. Louis office. And, finally, that defendant was a party to the contract only as escrow agent.

Upon execution of the contract, plaintiff deposited $16,000 with defendant and paid it $25 for its services as escrow agent.

On February 13, 1948, Mullen presented to Mr. Gunter at defendant's banking house in St. Louis six purported bills of lading for the steel. Mr. Gunter checked the bills and noted a discrepancy in the sizes of the sheets of steel. He called Mr. Wagner in Detroit, advised him that he had the bills of lading ''as required by the escrow agreement'', but that there was a discrepancy in the sheet sizes of the steel and stated to him the extent of it. Wagner agreed to accept them. Gunter asked Wagner to confirm this by letter, and advised Mullen to wait until the following Monday, February 16. Mullen took the bills of lading and left Gunter's office. On the same day, February 13, Wagner ▮▮▮▮ confirmed the conversation by letter.

This letter was received by Mr. Gunter on Monday, February 16, after which Mullen, on the same day, again appeared at the bank. Mr. Gunter delivered to him in exchange for the bills of lading defendant's corporate trust department check for the sum of $16,000, and mailed the bills of lading to Wagner in Detroit with a letter of transmittal.

In due course of mail, Wagner received Mr. Gunter's letter and forwarded the bills of lading to plaintiff's plant in Sturgis. Some three weeks thereafter, Wagner, upon inquiry, learned that the steel had not been received at the Sturgis plant. Upon further inquiry, he received information from the Louisville & Nashville Railroad Company, by whom the bills of lading were purportedly issued, that they were spurious and that no such a shipment of steel had been received by it. This suit ensued.

The petition pleaded the contract; alleged that by its terms defendant became trustee of an express trust with the duty to comply strictly with its terms; alleged a violation of that duty in paying to Mullen $16,000 without having presented to it original bills of lading;

and that no bills of lading had ever been issued covering a shipment of steel called for by the contract and that none was shipped. Defendant's answer admitted the contract, the receipt of $25 for its services as escrow agent, disbursement of $16,000 to Mullen, and denied the other allegations of the petition; and, as stated, affirmatively pleaded ratification of the acceptance of the bills of lading by defendant.

The aforesaid six bills of lading are on printed forms regularly in use by the Louisville & Nashville Railroad Company, and which are furnished to any shipper. Each of them purports to be an original bill of lading. They are identical in form, except as to the description of the packages and tonnages of steel in each. Written with pencil in blank spaces provided therein are the name of the consignee, destination and routing, car initials and numbers. Each purports to bear at the bottom thereof the name of R. E. Mullen as shipper and gives his address as 332 Paul Brown Building, St. Louis, Mo. In the space provided for place of origin of the shipment, there is a rubber stamp impression in large letters, "NEW ORLEANS, LA." Near the bottom of each bill of lading there appears a rubber stamp impression approximately one and one-half inches in width and two inches in height, reading as follows:

"RECEIVED SUBJECT TO TERMS
AND CONDITIONS OF THE
L. & N. R. R. CO.
BILL OF LADING
FEB 12 1948
[Here appears
a clock face]
L. & N. R. R. CO.
NEW ORLEANS, LA.
S. W, Bell, Agent"

Near the bottom of the stamp, and written over the last two lines thereof, is a purported pen signature of a name that appears to be "J. A. Leary".

S. W. Bell whose name appears as a part of the stamp last above described, testified that he was freight agent of the Louisville & Nashville Railroad Company at New Orleans on the date of these purported bills of lading and had supervisory capacity over all employees and duties at the local freight office in New Orleans. His office and the division freight agent's office in Louisiana had charge of all bills of lading issued by the L. & N. in New Orleans. Upon examination of these six purported bills of lading, he stated they were not issued by his office and he did not recognize the stamps nor the signature appearing thereon. No such stamps had been used since he had been in charge of the office. The stamp used in his office on

bills of lading on shipments such as these shipments purported to be was worded:

"S. L. & C.

L. & N. R. R.

S. W. BELL, Agent

Per ............."

Then followed a blank space to insert rubber stamp datings. The letters "S. L. & C." mean "shipper's load and count". He also produced the impressions of the five other stamps used by his office. None of them was worded as was the stamp affixed to the bills of lading here involved, nor did any of them carry his name.

The purported signature, "J. Leary", was not familiar to Bell, and there was no one under his supervision with any name like that or similar to it. Bell had charge of the records of bills of lading issued out of his office, and there was no record of these bills and no record of any shipments purportedly covered by them. He admitted on cross examination that bills of lading were issued out of the division freight office, but in such instances there would be no stamp with his name appearing thereon. There were some five persons in his office authorized to apply the stamp in use in his office and affix their signatures on the line marked "Per...........". He gave the names of those authorized to stamp and sign bills of lading issued by his office, and then further admitted that in the event of the illness of any of these parties other persons in his office might be authorized to act; and that he was not familiar with the signatures of all persons authorized to issue bills of lading for his company in New Orleans.

Melba Gibbons, an employee of Modern Press and Stationery Company, in St. Louis, testified that on or about the 5th day of February, 1948, a man unknown to her placed a rush order for a stamp or stamps, which she forwarded to Barnard Stamp Company in St. Louis for making. The records of her employer were unavailable, having been sent to the "FBI". One of the stamp impressions on the bills of lading was shown to her and she said it was similar to a stamp ordered by the unknown man. This order was duly filled by Barnard Stamp Company and returned to Modern Press and Stationery Company, and by it delivered to the unknown man when he called for it.

William G. Venker, who had been connected with Barnard Stamp Company for twenty-six years, testified that on the 9th day of February, 1948, his company made certain stamps on order from Modern Press and Stationery Company. He produced impressions of these stamps made at the time they were manufactured and was shown the two stamp impressions on each of the six bills of lading. . He stated positively that the impressions on the bills of lading were made from the stamps manufactured by his company in filling the order from Modern Press, and pointed out certain peculiarities of the impressions.

All stamps, he said, had certain peculiarities readily discernible by an experienced stamp maker. One of the several peculiarities of this stamp was the comma following the "W" in the name "S. W, Bell". The stamps, when made, had been sent to Modern Press and Stationery Company.

 Defendant contends plaintiff failed to prove "that the bills of lading were not signed by someone authorized to sign and issue bills of lading for the railroad and thus failed to prove that the bills of lading were not genuine * * *." It may be conceded; as argued by defendant, that it is not a prerequisite to a valid bill of lading that the carrier actually receive the goods purportedly covered by the bill if it was issued by an agent of the carrier having real or apparent authority so to do. Gleason v. Seaboard Air Line Railway Co., 278 U. S. 349, 49 S. Ct. 161, 73 L. Ed. 415.

There was no evidence that the bills of lading here in question were issued by any agent of the L. & N. Railroad Company. Therefore, the question for determination is: Did plaintiff make a prima facie showing that they were not so issued? Defendant contends it did not. Its argument runs in this wise: that the division freight office in New Orleans, over which Bell had no supervision, also issued bills of lading; that Bell was not familiar with the signatures of all persons who issue bills of lading out of New Orleans for the L. & N.; and that Bell admitted in cases of sickness of those authorized by his office to issue and sign bills others were authorized, but that plaintiff significantly failed to prove who they were, although there were records to show such fact.

This argument omits other pertinent evidence. These bills of lading did not purport to have been issued from the division freight office. They purported to be issued from the office of which S. W. Bell had charge. The stamp impressed thereon so indicated. There, was no record of their issuance in Bell's office, nor any record of the receipt of such a shipment. There was no employee named "J. Leary" or any similar name in his office. Neither the stamp "NEW ORLEANS, LA." nor the large stamp above set forth bearing the name of S. W. Bell were used by his office.

Defendant argues that an agent in the division freight office may have obtained and mistakenly or fraudulently affixed the S. W. Bell stamp on the bills. That is purely conjectural. There is no evidence or circumstance in the record to support it. On the other hand, the evidence was convincing that these two stamps were made in St. Louis in the early part of February. Mullen was shown to be in St. Louis about that time. The inference is clear that he had them made or was instrumental in having it done. That no shipment purportedly covered by them was ever made is a circumstance tending to show they were not issued out of any office of the railroad. We hold that the trial

court was warranted in submitting the issue of their genuineness to the jury.

Defendant next contends that it "did not by the escrow agreement guarantee the genuineness of the bills of lading and could only be liable for negligence in accepting them." It relies strongly upon the case of W. A. Havemeyer & Co. v. Exchange Nat. Bank of Tulsa, 293 Fed. 311, but we think the facts in that case, far too lengthy to set forth in this opinion, are readily distinguishable. Briefly summarized they are: Plaintiff's bank in Chicago wired defendant bank: "Notify and pay Southwestern Brokerage Co. $27,200 on delivery bills lading two cars sugar containing 800 bags each shipped from Utah on December sixteenth and seventeenth." The bank accepted the bills of lading presented to it and paid over the $27,000. These bills were spurious. The court held: "Of course, this wire contemplated and could be understood only as meaning true bills of lading for no one would authorize payment on forged, worthless, bills of lading. However, such an instruction is far different from one requiring the defendant to ascertain at its peril that such bills were genuine and thus become an absolute insurer thereof. Such an added onerous obligation is unusual in like business dealings and will not legally attach unless it be shown that such added obligation was understood and undertaken by the parties. The rule of law ordinarily applying is that the agent shall use reasonable care in ascertaining that the bills offered are genuine. There is no evidence from which we can infer that the parties intended any such unusual meaning and resultant obligations as contended for by plaintiff."

That is not the situation in this case. Here we have a formally executed contract wherein defendant, as an escrow agent for a consideration, was authorized "on behalf of the Purchaser to pay to the Seller, R. E. Mullen, the said sum of $16,000 upon presentation to the said Bank of the original bills of lading from the railroad, showing shipment of all of the steel above described, * * *." Of course, this means true original bills of lading, not forged ones. There is no evidence in the record of any business practice or custom warranting a departure from the strict terms of the contract.

"An escrow holder is charged with the performance of an express trust governed by the escrow agreement with duties to perform for each of the parties, which duties neither can forbid without the consent of the other." Nash v. Normandy State Bank, Mo., 201 S. W. 2d 299. Morris v. Davis, 334 Mo. 411, 66 S. W. 2d 833; Meredith v. Meredith, 287 Mo. 250, 229 S. W. 179; Seibel v. Higham, 216 Mo. 121, 115 S. W. 987. "Where a person assumes to and does act as the depositary in escrow, he is absolutely bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. It is not in his province to interpret or construe a contract where he has a duty to perform; he must be

guided in his duty by what the contract says." 19 Am. Jur. § 17, p. 435. To the same effect is 30 C. J. S. § 11, p. 1213.

Further cases cited by defendant are Boland v. Mercantile-Commerce Bank & Trust Co., 349 Mo. 731, 163 S. W. 2d 597, and Fairleigh et al. v. Fidelity National Bank & Trust Co., 335 Mo. 360, 73 S. W. 2d 248. In each of those cases a trustee was invested with a discretion in the sale and reinvestment of securities held in trust. He was held not liable for losses incurred in the bona fide and reasonably diligent exercise of that discretion. They are not in point.

██ Defendant assigns error in the use of the word "duly" in Instruction No. 2 given in behalf of plaintiff. The instruction told the jury that even if they found the bills of lading were on forms in use by the L. & N. Railroad, yet they could not become such unless they were duly signed by an authorized agent of the railroad. The purpose of the instruction is clear. It was to advise the jury that a form of bill of lading was not sufficient unless duly signed or stamped by one whose act would legally bind the railroad. Cromwell v. Slaney, 65 Fed. 2d 940, 941. Furthermore, Instruction No. 7, given at the request of defendant, directed that "* * * unless you also find and believe from the evidence that the aforesaid bills of lading were not stamped or signed by any agent or employee authorized to issue bills of lading * * *, your verdict shall be for the defendant." If there is any difference in the meaning of the two instructions, the one given in behalf of defendant is more favorable to plaintiff. The assignment is without merit.

██ The last assignment of error is the court's refusal to declare a mistrial when the witness, Melba Gibbons, was asked to state the date the order for stamps was placed with Modern Press and Stationery Company, she replied; "It was around the 5th of February, but I couldn't give the exact date, because the copy has gone to the FBI."

It may well be doubted whether the voluntary statement was prejudicial. There is little, if any, real dispute that the bills of lading were in fact fraudulent. Under the record in this case, any juror would infer that Mullen was an imposter. Would it be prejudicial for them to learn that an investigation was being conducted? In any event, however, there is no suggestion that plaintiff's counsel invited or anticipated the voluntary statement. The question did not call for it. Counsel for plaintiff readily agreed that the jury might be instructed to disregard it. The court offered to do so, but counsel for defendant refused the offer. A trial court cannot be convicted of error in such a situation. Plannett v. McFall, Mo. App., 284 S. W. 850, 854; Eth v. Kansas City, Mo. App., 63 S. W. 2d 203, 205, 206.

The judgment is affirmed. All concur.